In the Matter of the Application of JENNIE PETERS PARKER, Appellant, for an Order Appointing Commissioners to Fix Damages Pursuant to Section 85 of the Indian Law of the State of New York.

THE TONAWANDA NATION OF SENECA INDIANS, Respondent.

Fourth Department, November 7, 1929.

*John L. Heider,* for the appellant.

*George W. Watson* and *William J. Darch,* for the Tonawanda Nation of Seneca Indians.

*Hamilton Ward, Attorney-General [Henry S. Manley, Assistant Attorney-General,* of counsel], *amicus curiœ.*

SEARS, P. J.   The petitioner is an enrolled member of the Tonawanda Nation of Seneca Indians and resides on the reservation of that nation in Genesee county.   She is possessed of a farm of about eleven acres, a part of the reservation.   Acting under the provisions of section 85 of the Indian Law, the district attorney of Genesee county, as attorney for the nation, has contracted on behalf of the nation with one Sadie E. Nobles for the sale of gypsum, or plaster rock, to be removed by the purchaser from the reservation during a period of twenty years.   Under this contract, which was at once assigned by Sadie E. Nobles to the Universal Gypsum and Lime Company, that company has engaged in the mining of gypsum upon the reservation, and from a shaft or shafts on reservation lands other than those possessed by the petitioner, has constructed tunnels for the removal of gypsum which extend underground and under the lands possessed by the petitioner, and in this way there has been extracted from under the land in the possession of petitioner a considerable quantity of gypsum.   These mining operations have done no damage whatever to the surface of the land in the possession of the petitioner.

The statute under which the contract which provides for mining on the reservation and the sale of the gypsum mined was authorized, reads as follows: " The attorney of such nation, for the benefit of such nation, may contract for the sale of any gypsum, or plaster stone upon the Tonawanda reservation, on such terms as he may deem just, but for not less than one dollar a cord in the quarry for the first five hundred cords taken out each year, and fifty cents for each additional cord, which contract shall be in writing, to be performed within twenty years from the making thereof.   He may also contract for the sale of sand, gravel and refuse stone at a rate of not less than one dollar per car for the same but this contract shall be ratified by the peacemakers of the said nation before it shall take effect.   A person purchasing such gypsum, at the time of contracting, shall execute a bond, with sufficient sureties, approved by such attorney, conditioned for the faithful execution of such contract, and the payment of the purchase price of such gypsum or plaster stone.   Upon executing such bond, such person may lawfully enter upon such reservation, at the place or places designated in such

contract, whether upon the common lands, or upon the individual improvements of the members thereof, for the purpose of quarrying and removing such gypsum, sand, gravel or stone, doing no unnecessary damage or injury. Out of the moneys arising from such sale, the attorney shall pay to the persons entitled thereto, for any injury or damage necessarily done to individual improvements or property, by the quarrying or removal of such gypsum, sand, gravel or stone, which damages, in case of disagreement, shall be fixed by three commissioners appointed by the County Court of Genesee county, upon the application of the party aggrieved, three days' notice of such application having been given to such attorney. The surplus moneys arising from such sale remaining in the hands of such attorney after the payment of such damages, shall be paid by him, for the benefit of such nation, to the Indian agent appointed by the United States government for the State of New York. Such money shall be added to the annuity granted by the United States to such nation, and distributed and paid over to such nation at the same time and in the same manner as such annuity. Such agent shall receive for his services in receiving, distributing and paying over such moneys, five per centum of the amount received by him from the attorney of such nation."

It is the contention of the petitioner that the words " any injury or damage necessarily done to individual improvements or property," in the statute just quoted, give her a right to receive the full contract price of all the product coming from underneath the land possessed by her, it being stipulated that if she is entitled to any damage whatever that is the measure of damage to be applied. The petition prays for the appointment of commissioners as provided in the statute to fix the amount of her damage. The substance of her claim is that either as an owner in fee or as the owner of a right equivalent in this respect to that of an owner in fee, all property, including minerals lying below the surface of the land in her possession belongs to her. It is the contention on the part of the respondent Indian nation on the other hand that the petitioner, although an allottee of land in the reservation and entitled to the possession of it in accordance with Indian customs and usages, is not the owner of minerals underlying the land, but that these belong to the nation, or the State in trust for the nation.

It is, therefore, necessary to determine what right, if any, a member of this Indian nation has in minerals underlying land in her possession by allotment, entered in the Indian records in accordance with the statute of the State.

The petitioner does not attack the validity of the statute under which the contract for the mining and sale of gypsum was made,

nor does she repudiate or attempt to repudiate the contract. She seeks relief solely under the terms of the statute for acts done under authority expressed in the statute.

The petitioner's right to the possession of land within the reservation is based upon an allotment recorded in the book of the clerk of the Tonawanda Nation of Indians. This entry, or record, according to the allegation of the nation's answer, was made on the 1st day of May, 1885. At that time the provisions of law relating to allotments were as follows:

" The lands within the said reservation, not already cultivated and improved or inclosed by fences by individual Indians, shall be deemed to be held in common by the said Tonawanda Band of Seneca Indians, and they shall be subject to the control of the chiefs of said band. No land within the said reservation not already cultivated and improved or under fence, shall hereafter be appropriated by any Indian to his own use, without the consent of the chiefs in council; whose duty however it shall be on application, to allot and set apart for any Indian or any Indian family, so much wild land as the chief shall deem reasonable and an equitable proportion in reference to the whole number not possessing lands. The description of such lands shall be submitted by the respective claimants to the chiefs in council assembled, and shall be approved by the council before they shall be recorded." (Laws of 1861, chap. 283, § 16, as revised by Laws of 1863, chap. 90, § 16.)

" Lands on the said reservation which are appropriated by any Indians or family to their own use, and cultivated or improved by them, shall within two years after this act takes effect be described by the person or persons claiming the same, with convenient certainty, and be entered in the book of records kept by the clerk of the said Indians, and if not so entered the claimant thereof shall not be entitled to maintain any suit under the provisions of this act, for encroaching or trespassing thereon." (Laws of 1861, chap. 283, § 17, as revised by Laws of 1863, chap. 90, § 17.)

The title to the Tonawanda Reservation is vested in the Comptroller of the State of New York and his successors, in trust for the Indian nation. (See Seneca Nation v. Christie, 126 N. Y. 122; Jemison v. Bell Telephone Co., 186 id. 493.) Section 7 of the Indian Law authorizes the partition of tribal lands among members of the nation, and after such partition provides for an ownership in severalty in fee in the individual Indians to whom any portion is thus set off. Although this provision has been in force in substantially its present form for upwards of thirty-seven years (Laws of 1892, chap. 679, § 7, and see Laws of 1849, chap. 420, §§ 7, 8, 9 and 10), it is stated in respondent's brief, and, no doubt, correctly, that no partition of

lands in the Tonawanda Reservation has been made. The petitioner makes no claim to title under section 7 of the Indian Law.

A reading of section 85 of the Indian Law, quoted above, shows these elements: The attorney for the nation making the contract, acts solely for the benefit of the nation; quarrying or mining may be done upon lands in the possession of individual Indians as well as upon the lands possessed in common by the nation; distribution of the purchase price of the product as such is to be paid to any individual member of the nation; there is, however, to be a division of the purchase price in case of damage or injury to individual improvements or property between the owner of the improvements and property and the nation; the owner of the individual improvements or property injured or damaged is to be compensated for his damage, and the balance paid over into the treasury of the nation. These features seem to point to payment to the nation of the purchase price of the mineral mined, whether it comes from lands under an individual improvement or whether it comes from underneath the undivided lands of the reservation, with a deduction only of the amount actually lost by an allottee through injury or damage to his possessions. The statute seems to imply that the individual Indian is not the owner of the underlying minerals as such.

The petitioner, however, argues that as her interest as an allottee is the only interest which an Indian can have as long as the tribal organization and reservation system persists, her interest in respect to what underlies the surface of the land is to be regarded either as the right of an owner in fee or the right of one having a title analogous to that of an owner of the fee. The right of an Indian allottee of a part of tribal lands, however, is far from being a title in fee or analogous to such a title. The statutes provide, in general, for what may and what may not be done by an allottee. For example, in 1861 the following statute was enacted in respect to the Tonawanda Reservation: " Any Indian residing on the said reservation, having land allotted to him by the chiefs, or entered as herein provided, may sell, for his own benefit, any timber or trees, or stone or plaster on that portion of such land which he shall actually and in good faith clear for the purpose of cultivation. But no white person shall, under pretence of being hired by any Indian, or any other pretence, be employed in removing any timber, or wood, or stone, or plaster from said reservation, or cutting down any trees or quarrying for that purpose." (Laws of 1861, chap. 283, § 18.) This provision was revised in 1863, substantially with the same phraseology. (Laws of 1863, chap. 90, § 18.)

It is to be noted here that while certain rights were given in relation even to the sale of plaster (meaning the mineral now known as

gypsum, the purchase price of which is the basis of this controversy), nevertheless, the power to sell was strictly limited to that removed from the cleared portion of the allotted land. In 1873 this section was amended and the limited permission previously granted to an individual to sell stone and plaster from his allotment was omitted. (Laws of 1873, chap. 394, amdg. said § 18.) At the same time there was added to section 22 of the act of 1863 a provision for the sale of gypsum or plaster stone by the attorney for the band or nation for the benefit of the nation with express provision for entry on the reservation for the removal of such mineral, whether upon the common lands of the nation, or upon the individual improvements. This provision of statute is now embodied, with certain amendments, in section 85 of the Indian Law, quoted above. Since the enactment of the law of 1873 the individual allottee has not been authorized to sell the minerals either on the surface or underlying the land possessed by him, or able to prevent their sale by the attorney for the nation. Allotted lands may not be sold to one not a member of the nation. (N. Y. Const. art. 1, § 15; Penal Law, § 2030.) Allotted lands may not even be leased to a non-member without a permit from the council of the nation, and approval by the nation's attorney. (Indian Law, § 83.) Dower does not attach. (*Terrance* v. *Gray*, 171 App. Div. 11.)

In *Reservation Gas Co.* v. *Snyder* (88 Misc. 209) an allottee of lands upon the Cattaraugus Reservation, whose rights are similar to the rights of an allottee on the Tonawanda Reservation (Indian Law, § 55), threatened to interfere with the plaintiff which was about to drill an oil well on the improvement of the allottee pursuant to a lease given by the Indian nation which had been ratified by act of Congress. Mr. Justice (now Judge) POUND, in the course of the opinion, said " that even though the customary title by occupancy vests in the individual Indian for agricultural purposes, Congress refuses to recognize the right of the individual to acquire oil and gas rights by such occupancy, but recognizes the authority of the Indian council to dispose of such rights, with congressional approval, for the benefit of the nation as a whole." Similarly here, while the allotment gives to the allottee the full Indian title to the improvement which includes the exclusive right of possession for agricultural and domestic purposes (*Jemison* v. *Bell Telephone Co., supra; Tuscarora Nation of Indians* v. *Williams,* 79 Misc. 448; *Hatch* v. *Luckman,* 64 id. 508), the State of New York refuses to recognize the right of the individual to the mineral rights below the surface, at least so far as gypsum and plaster stone is concerned, but does recognize the right of the Indian nation, as a whole, to such minerals

and has made provision for the mining and sale of such minerals for the benefit of the nation.

The point decided in *Jemison* v. *Bell Telephone Co.* (*supra*) does not support the petitioner's case. Although the judgment of the Special Term there affirmed purported to find the allottee an owner in fee, nevertheless, the gist of the decision was merely to the effect that under section 89 of the Indian Law, added by chapter 296 of the Laws of 1902 to chapter 679 of the Laws of 1892, being former Indian Law (now section 90 of the Indian Law), an allottee on the Tonawanda Reservation could, as that act provided, maintain an action of ejectment for the removal of poles and wires across the allotment. The decision recognizes the constitutionality of that section, but determines nothing as to the character or extent of the Indian title other than as stated. The words " owner in fee " must in the light of the context be equivalent to full Indian title and nothing more. (*Reservation Gas Co.* v. *Snyder, supra.*)

Section 2 of the Indian Law, which provides that a native Indian may take, hold and convey real property the same as a citizen, is not determinative of the rights of an allottee. That section relates solely to the right of an Indian to acquire, hold and convey real property off the reservation. (*Plummer* v. *Hubbard*, 207 App. Div. 29; *Terrance* v. *Crowley*, 62 Misc. 138; *Terrance* v. *Gray, supra; Jimeson* v. *Pierce*, 78 App. Div. 9.)

In *Jimeson* v. *Pierce* (*supra*) the court was dealing with the right of an Indian to hold real property in fee after a partition under the authority of the statutory provision now embodied in section 7 of the Indian Law, and not with the quality of an allottee's title.

The petitioner has no right, as an individual allottee, to any part of the purchase price of the gypsum underlying her improvement, and inasmuch as the surface of the land held by her has not been damaged in any manner up to the present time, she has shown no injury or damage to her individual improvement and is not entitled to the appointment of commissioners.

The final order should, therefore, be affirmed, without costs.

All concur. Present — Sears, P. J., Taylor, Edgcomb, Thompson and Crosby, JJ.

Order affirmed, without costs of this appeal to either party.